IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FRANCES OLIVER PACKETT,                )
    Plaintiff,                              )
                                            )
          v.                             )          Civil No. 3:17cv677 (REP)
                                            )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social Security,  )
    Defendant.                              )
_____)

## REPORT AND RECOMMENDATION

On August 6, 2012, Frances Oliver Packett ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from

February 15, 2008. The Social Security Administration ("SSA") denied Plaintiff's claim both

initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied

Plaintiff's claim in a written decision and the Appeals Council granted Plaintiff's request for

review, remanding the case to an ALJ for resolution. The ALJ again denied Plaintiff's claim in a

written decision and the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in: (1) assigning little or limited weight to the opinions of Plaintiff's

treating physicians and nurses; (2) failing to properly evaluate Plaintiff's testimony related to her

mental impairments; and, (3) relying on a flawed hypothetical question to the vocational expert

("VE"). (Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 7) at 1-32.)

This matter now comes before the Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.      PROCEDURAL HISTORY

On August 6, 2012, Plaintiff filed an application for DIB with an alleged onset date of February 15, 2008. (R. at 232-39.) The SSA denied these claims initially on December 7, 2012, and again upon reconsideration on July 22, 2013. (R. at 238-39, 250.) At Plaintiff's written request, the ALJ held a hearing on September 25, 2014. (R. at 185.) On November 5, 2014, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because she could perform jobs existing in significant numbers in the national economy. (R. at 253-71.) On March 22, 2016, the Appeals Council granted Plaintiff's request for review, remanding the case to an ALJ for resolution. (R. at 272-74.) The Appeals Council directed the ALJ to further evaluate Plaintiff's mental impairments, give further consideration to Plaintiff's maximum residual functional capacity ("RFC"), further evaluate Plaintiff's subjective complaints and obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments. (R. at 15.)

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

On January 24, 2017, the ALJ held a second hearing to reconsider Plaintiff's claim. (R. at 39-82.) On March 1, 2017, the ALJ issued a written opinion denying Plaintiff's claim and again concluding that Plaintiff did not qualify as disabled under the Act, because she could perform jobs existing in significant numbers in the national economy. (R. at 12-38.) On August 3, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-5.)

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v.*

3

*Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation).  To summarize, at step one, the ALJ looks at the claimant's current work activity.  § 404.1520(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  § 404.1520(a)(4)(ii).  Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations.
§ 404.1520(a)(4)(iii).  Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations.
§ 404.1545(a).  At step four, the ALJ assesses whether the claimant can perform her past work given her RFC.  § 404.1520(a)(4)(iv).  Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy.  § 404.1520(a)(4)(v).

4

## III.    THE ALJ'S DECISION

On January 24, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 39-82.) On February 24, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 12-38.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 18-31.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of February 15, 2008 through her date last insured of June 30, 2013. (R. at 18.) At step two, the ALJ found that Plaintiff had the following severe impairments: conversion disorder, affective disorder, anxiety disorder, degenerative disc disease, perceived migraine headaches and perceived syncope[2]/seizures. (R. at 18.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-22.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform medium work with the following exertional limitations. (R. at 22.) Plaintiff could lift and carry twenty-five pounds frequently and fifty pounds occasionally, sit/stand/walk for six hours in an eight-hour workday, constantly push or pull at the medium level of exertion, and never climb ladders, ropes or scaffolds. (R. at 22.) The ALJ precluded Plaintiff from workplace hazards such as unprotected heights or moving mechanical parts. (R. at 22.) Plaintiff could understand, remember and carry out short, simple instructions consistent with the ability to perform unskilled

---

[2]    Syncope episodes consist of "temporary suspension of consciousness due to generalized cerebral ischemia; called also faint." *Syncope,* Dorland's Illustrated Medical Dictionary (32d ed. 2012).

work. (R. at 22.)  Plaintiff could have occasional interactions with supervisors and co-workers,

but no interaction with the public.  (R. at 22.)  At step four, the ALJ found that Plaintiff did not

have any past relevant work.  (R. at 30.)  At step five, the ALJ determined that Plaintiff could

perform jobs existing in significant numbers in the national economy.  (R. at 30-31.)  Therefore,

Plaintiff did not qualify as disabled under the Act.  (R. at 31.)

IV.   ANALYSIS

Plaintiff, fifty-one years old at the time of this Report and Recommendation, previously

worked as a cook and maintenance person in a restaurant chain.  (R. at 249, 798.)  She applied

for Social Security Benefits, alleging disability from back pain, migraines, black-out spells,

learning disability, high blood pressure and asthma, with an alleged onset date of February 15,

2008.  (R. at 232.)  Plaintiff's appeal to this Court alleges that the ALJ erred in:  (1) affording

little or limited weight to the opinions of Plaintiff's treating physicians; (2) failing to properly

evaluate Plaintiff's testimony related to her mental impairments; and, (3) relying on a flawed

hypothetical question to the VE.  (Pl.'s Mem. at 21-32.)  For the reasons set forth below, the ALJ

did not err in his decision.

### A. Substantial Evidence Supports the ALJ's Assignments of Weight and RFC Determination.

Plaintiff argues that the ALJ erred by assigning little or limited weight to the opinions of

Joseph Dolansky, D.O., and Prakash Ettigi, M.D. — Plaintiff's treating physicians — and

Victoria McKay, N.P., and Pamela Morrison F.N.P. — Plaintiff's nurses.  (Pl.'s Mem. at 21-25.)

Defendant responds that substantial evidence supports the ALJ's decision, because Dr. Ettigi, Dr.

Dolansky, Nurse Morrison and Nurse McKay signed their opinions after the date last insured;

6

and, the record does not support the opinions.  (Mem. in Support of Def.'s Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 11) at 16-20.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527.  When the record contains a number of different medical opinions, including those from the claimant's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.  § 404.1527(c).  If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved.  §§ 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight.  SSR 06-03p.[3]  Acceptable medical sources include licensed physicians and licensed or certified psychologists.

---

[3]     Effective March 27, 2017, the SSA rescinded SSR 06-03p, instead of incorporating some of the Ruling's policies into 20 C.F.R. § 404.1527(f).  82 Fed. Reg. 5844-01, at 5844-45m 5854-55 (Jan. 18, 2017).  Plaintiff filed her claim on August 6, 2012, before this ruling took effect.  (R. at 232-39.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

7

§ 404.1502(a). The ALJ may also consider evidence from "other sources" — including nurse-practitioners, therapists and social workers — as evidence of the severity of impairment or for the effect that the impairments have on the claimant's ability to work. § 404.1513(d).[4] Under the applicable regulations and case law, an ALJ must give a treating source's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.[5] Notably, the ALJ does not have to accept an opinion from a treating source that opines on the claimant's ultimate disability for employment purposes, or when the treating source's opinion is inconsistent with other evidence or is not well-supported. §§ 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, a reviewing court will leave untouched an ALJ's decision regarding the weight afforded to a medical opinion unless the ALJ failed to give a sufficient reason for the

---

[4]     The regulations detail that "other sources" include medical sources that do not qualify as "acceptable medical sources" under 20 C.F.R. § 404.1513(a). The given examples constitute a non-exhaustive list.

[5]     Effective March, 27, 2017, the SSA rescinded SSR 96-2p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed her claim on August 6, 2012, before the regulation took effect. (R. at 232-39.) As previously stated, the Agency lacks the power to engage in retroactive rulemaking. Thus, SSR 96-2p applies to Plaintiff's claim.

weight afforded. *Id.* In other words, the ALJ's assignments of weight stand unless the ALJ

failed to offer a sufficient reason for her decision. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1)

the length of the treating source relationship and frequency of examination; (2) the nature and

extent of the treatment relationship; (3) supportability based upon the medical record; (4)

consistency between the opinion and the medical record; (5) any specialization on the part of the

treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same

regulations specifically vest the ALJ — not the treating source — with the authority to determine

whether a claimant is disabled as that term is defined under the Act. § 404.1527(d)(1). Although

the regulations explicitly apply these enumerated factors only to treating sources, those same

factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

Additionally, the ALJ may consider the time frame of the evidence. The relevant time

period spans from the alleged onset — February 15, 2008 — through the date last insured —

June 30, 2013. Plaintiff must prove her disability within that time frame. 20 C.F.R.

§§ 404.101(a), 404.130; *Johnson*, 434 F.3d at 655-56. While the ALJ may consider evidence

created after the date last insured, the evidence must provide a link to Plaintiff's condition *before*

the date last insured. *Bird*, 699 F.3d at 340-41. Evidence "not linked in any manner to the

claimant's condition before her [date last insured]" has no relevance on the ALJ's determination,

and the ALJ does not need to retroactively consider it. *Johnson*, 434 F.3d at 655-56.

Here, Dr. Dolansky treated Plaintiff only once before the date last insured. (R. at 1037-

38, 1040-41.) Plaintiff saw Dr. Ettigi only after the date last insured. (R. at 1225-31.) Nurse

Morrison treated Plaintiff for two months during the relevant period and Nurse McKay treated

Plaintiff over three years after the relevant period ended. (R. at 1219-23, 1260-64.)   When

reviewing the ALJ's decision, the Court will therefore review evidence in the record from the

relevant time period — from February 15, 2008 through June 30, 2013 — and any evidence

thereafter that specifically relates back to Plaintiff's condition at that time.

### 1. Dr. Dolansky's Opinion

The ALJ did not err in assigning little weight to Dr. Dolansky's opinion and offered

specific reasoning for the weight assigned.  Dr. Dolansky, a psychiatric specialist, diagnosed

Plaintiff with mood disorder and pseudobulbar affect secondary to a traumatic brain injury

("TBI") on May 1, 2013, and again on September 16, 2013.  (R. at 1037-38, 1040-41.)  On May

1, Dr. Dolansky reported that Plaintiff displayed impaired attention and concentration, pressured

speech, a depressed and anxious mood, and tangential thought processes with loose associations.

(R. at 1037.)  On September 16, Plaintiff showed improvement with fair attention and

concentration and normal speech, but she still exhibited anxious and depressed mood with

tangential thought processes and loose associations.  (R. at 1040.)  Dr. Dolansky then signed

treatment notes prepared by Albert Archard, L.C.S.W., from August 13, 2013 until January 3,

2014, diagnosing Plaintiff with a mood disorder.  (R. at 1042-44, 1100.)

Finally, on October 10, 2013, Mr. Archard completed a psychiatric/psychological

impairment questionnaire on behalf of Plaintiff.  (R. at 1045-52.)  Dr. Dolansky signed the

questionnaire on December 5, 2013.  (R. at 1052.)  In the questionnaire, Mr. Archard and Dr.

Dolansky opined that Plaintiff displayed difficulty thinking or concentrating, hostility and

irritability, as well as poor memory.  (R. at 1046.)  According to the questionnaire, Plaintiff

appeared mildly limited in the ability to understand and remember detailed instructions and carry

10

out simple one or two-step instructions.  (R. at 1048.)  Mr. Archard and Dr. Dolansky classified

Plaintiff as moderately limited in her ability to carry out detailed instructions and to sustain an

ordinary routine without supervision.  (R. at 1048.)  Finally, Plaintiff had marked limitations in

her ability to maintain attention and concentration for extended periods of time and her ability to

work in coordination with or in proximity to others without being distracted by them.  (R. at

1048.)

 The ALJ assigned "little weight" to these opinions, because Dr. Dolansky signed the

opinions after Plaintiff's date last insured and the opinions contradicted the longitudinal record.

(R. at 27.)  The ALJ cited three aspects of the record that conflicted with these opinions:  (1) the

objective findings in Plaintiff's diagnostic tests and examinations; (2) Plaintiff's statements that

medication relieved her pain; and, (3) Plaintiff's daily activities, including "walk[ing] every day,

go[ing] to church, go[ing] out to the movies, draw[ing], mak[ing] sculptures...[and] spen[ding] a

lot of time with her grandchildren."  (R. at 27.)  Substantial evidence supports the ALJ's

decision.

 First, Dr. Dolansky's opinion regarding Plaintiff's memory and concentration limitations

conflicts with his own examination notes and reports.  On May 1, 2013, Dr. Dolansky stated that

Plaintiff had normal memory, perception and a good fund of knowledge despite Plaintiff's

impaired attention and concentration, pressured speech and agitated behavior during the same

appointment.  (R. at 1037.)  Dr. Dolansky started Plaintiff on Depakote and Celexa and

recommended that she return in four to five weeks.  (R. at 1038.)  Plaintiff failed to attend a

scheduled appointment with Dr. Dolansky on August 5, 2013.  (R. at 1039.)  On September 16,

2013, Plaintiff returned to Dr. Dolansky more than four months after her initial appointment.  (R.

at 1040-41.) Dr. Dolansky noted Plaintiff's normal appearance, behavior, and memory as well as her fair attention and concentration. (R. at 1040.) However, Plaintiff displayed depressed mood, delusional thought content and loose associations. (R. at 1040.) Dr. Dolansky refused to prescribe any psychotropic medications and recommended further treatment in six to seven weeks. (R. at 1041.) Dr. Dolansky treated Plaintiff once more on October 29, 2013 and noted her normal appearance, behavior, mood, thought content and memory. (R. at 1089-90.) Dr. Dolansky further described Plaintiff's fair attention and concentration. (R. at 1089.) Plaintiff reported increased daily activities and Dr. Dolansky noted that medication worked well to treat both Plaintiff's migraines and seizure disorder. (R. at 1089.)

Dr. Dolansky's own observations do not support his opinion. His medical examinations indicated that Plaintiff displayed normal memory during all three occasions that he treated Plaintiff. (R. at 1037, 1040, 1089.) Plaintiff displayed fair attention and concentration during two of these appointments. (R. at 1040, 1089.) Also, Dr. Dolansky reported that Plaintiff's medication had relieved her symptoms. (R. at 1089.) These findings conflict with Dr. Dolansky's opinion that Plaintiff possessed poor memory and marked limitations maintaining attention or concentrating.

Second, objective medical evidence in the record contradicts Dr. Dolansky's opinion regarding Plaintiff's mental limitations. Specifically, Dr. Dolansky diagnosed Plaintiff with mood disorder secondary to a TBI and found that Plaintiff had moderate limitations in carrying out detailed instructions and sustaining a routine without supervision, as well as marked limitations in maintaining attention and concentration for extended periods or working with others. (R. at 1048-55.) Dr. Dolansky described Plaintiff's marked limitations interacting with

12

the public, asking simple questions, requesting assistance, getting along with peers or maintaining appropriate behavior to adhere to basic standards of neatness and cleanliness. (R. at 1049.) Further, Dr. Dolansky opined that the symptoms causing Plaintiff's limitations began during her childhood. (R. at 1052.)

On January 15, 2010, almost two years after her alleged onset date, Plaintiff reported to medical professionals at Tappahannock Hospital that she did not have a history of headaches. (R. at 850.) On January 24, 2011, Plaintiff presented to the Tappahannock Primary Urgent Care Facility, complaining of chest pain and a migraine. (R. at 666.) This visit marked the first time in the record where Plaintiff noted psychological symptoms. During a physical evaluation from James McCorry, D.O., Plaintiff reported "no syncope." (R. at 666.) Dr. McCorry described Plaintiff as comfortable, alert and oriented. (R. at 667.) Plaintiff displayed no motor, sensory or cerebellar deficits and her speech, gait and memory all tested normally after a "complex assessment was performed." (R. at 667-68.) Plaintiff took Dilaudid for pain, Zofran for nausea and Imitrex for migraines. (R. at 667.)

On January 26, 2011, Plaintiff treated at King and Queen Family Practice with Linda Mitchell, N.P., for a physical assessment. (R. at 649-53.) Plaintiff stated that she suffered from migraines but reported "no current complaints." (R. at 649.) Plaintiff appeared well-developed with a normal gait. (R. at 651.)

On February 15, 2011, Plaintiff treated for "syncope, nausea and vomiting, [and] headache." (R. at 645-48.) During this visit, Plaintiff reported a syncope event witnessed by her child. (R. at 645.) William Gwathmey, M.D., performed a physical examination and Plaintiff appeared well-oriented. (R. at 646-47.) Dr. Gwathmey referred Plaintiff to a neurologist and

13

prescribed Bystolic and Maxalt for migraines. (R. at 647-48.) On February 23, 2011, Plaintiff

saw James Grimson, M.D. (R. at 724.) Dr. Grimson analyzed a computed tomography ("CT")

scan and noted "normal" results with "no evidence of mass . . . or hemorrhage." (R. at 724.)

On March 10, 2011, Noma Rehman, M.D., saw Plaintiff for a neurological assessment

based on Dr. Gwathmey's referral. (R. at 654.) Plaintiff complained of "passing out spells [for

the] last 3 month[s]," and a "total of four [syncope] episode[s]." (R. at 654.) Dr. Rehman noted

that Plaintiff appeared oriented, well-nourished, and articulate, and reported normal physical

examination results. (R. at 655.) Plaintiff displayed normal fund of knowledge with alert

attention and concentration. (R. at 655.) Dr. Rehman noted that Plaintiff's reported symptoms

appeared "suggestive of a complicated migraine." (R. at 655.)

On April 11, 2011, Plaintiff returned to Dr. Gwathmey for syncope, nausea, vomiting and

headache. (R. at 641-44.) Plaintiff reported that she experienced a syncope event witnessed by

her child and boyfriend. (R. at 641.) Plaintiff also reported that her neurologist told her that "all

of her tests had come back negative." (R. at 641.) Plaintiff could not remember when her

headache symptoms began and stated that all physical examinations revealed "normal" results

with articulate speech, no apparent distress, normal orientation and no memory loss. (R. at 641-

43.)

On April 21, 2011, Plaintiff returned to Dr. Rehman for a follow-up neurological

examination. (R. at 657-59.) Plaintiff reported no syncope until 2011 and only one syncope

event since March. (R. at 657.) Plaintiff's magnetic resonance imaging ("MRI") and

electroencephalogram ("EEG") yielded normal results, and Plaintiff appeared alert and oriented.

(R. at 658.)

14

On May 12, 2011, Plaintiff saw Dr. Gwathmey again for syncope, nausea, vomiting and headaches.  (R at 638-40.)  On this visit, Plaintiff reported another syncope event witnessed by Plaintiff's child.  (R. at 638.)  Dr. Gwathmey noted normal neurological examination results with alertness, coordination, memory and orientation.  (R. at 639-40.)

On June 21, 2011, Plaintiff visited the emergency room at Tappahannock Primary Hospital and treated with Thomas Cleary, M.D.  (R. at 833.)  Plaintiff reported a syncope episode and stated that her neurologist "did not know why she was blacking out."  (R. at 833.)  Dr. Cleary reported normal physical examination results and no current prescriptions.  (R. at 833.)  Plaintiff displayed normal gait, concentration, insight and affect.  (R. at 834.)  Plaintiff appeared oriented, but anxious.  (R. at 834-35.)

On July 16 and August 12, 2011, Plaintiff returned to the Tappahannock Primary Hospital emergency room, complaining of a headache and vomiting.  (R. at 876, 882.)  During these visits, Daniel Emmeth, M.D., and Thomas Henderson, M.D., both noted Plaintiff's normal insight and concentration.  (R. at 877, 883.)  Dr. Emmeth further reported that Plaintiff arrived with "steady gait to treatment area," and two hours later, she "[felt] better and ready to go" after receiving saline, Dilaudid and Zofran injections.  (R. at 878.)

On December 20, 2011, Plaintiff returned to the emergency room with difficulty breathing.  (R. at 893.)  Plaintiff stated that the breathing difficulty began during a family argument.  (R. at 893.)  Plaintiff displayed normal insight and concentration.  (R. at 894.)  Plaintiff appeared "tearful" and "anxious," but testing revealed "no clinically significant lab abnormalities."  (R. at 896-97.)

15

On January 1, 2012, Plaintiff returned to the Tappahannock Primary Hospital emergency room for a migraine and treated with Walter Kaniefski, M.D. (R. at 900.) Plaintiff reported symptoms of diarrhea, nausea, vomiting and severe headache. (R. at 900.) Plaintiff displayed normal gait, insight and concentration. (R. at 901-02.) Further, Dr. Kaniefski described Plaintiff as cooperative, alert and oriented, and in "no acute distress." (R. at 902.)

On April 5, 2012, Plaintiff returned to the Tappahannock Primary Hospital emergency room for headache and vomiting. (R. at 838-41.) During this visit, Plaintiff treated with James Dudley, M.D., and reported "syncopal episodes and urinary incontinence" secondary to nausea and vomiting associated with migraine pain. (R. at 838.) Plaintiff could not afford her prescribed medicines. (R. at 839.) Dr. Dudley reported normal physical examination results, including Plaintiff's normal gait, insight, affect and concentration. (R. at 839.) Additionally, Plaintiff appeared comfortable, cooperative, alert and oriented. (R. at 840.) That same day, Plaintiff went to Tappahannock Hospital's diagnostic imaging consultation department for a CT scan. (R. at 725.) Sharon Outten, M.D., evaluated the CT scan results as normal with "no evidence of mass, hemorrhage, acute infraction, or other active focal intracerebral abnormality." (R. at 725.)

Plaintiff returned to the Tappahannock Primary Hospital emergency room with complaints of vomiting and migraines twice in May 2012. (R. at 913-21.) During those visits, Plaintiff treated with Dr. McCorry and Hugh Hemsley, M.D. (R. at 913-18.) On May 2, 2012, Plaintiff reported that she could not afford her prescribed medications. (R. at 913.) Dr. McCorry noted Plaintiff's normal speech and memory. (R. at 914.) Dr. McCorry also described Plaintiff as oriented and walking with a "steady gait to treatment area" upon arrival. (R. at 915.) On May

16

6, 2012, Dr. Hemsley described Plaintiff as oriented and later as "feeling much better [and] stable to [discharge]." (R. at 919, 921.) Plaintiff then returned to the emergency room on July 22, 2012, concerned with an allergic reaction to medications. (R. at 933.) Dr. Emmeth described Plaintiff as anxious but with normal concentration, insight and orientation. (R. at 927.) Michael Bermudez, M.D., also noted that Plaintiff displayed no nausea, fever or vomiting. (R. at 933.) Plaintiff had a normal affect and "appear[ed] to be comfortable." (R. at 934.)

On August 7, 2012, Plaintiff returned to the Tappahannock Primary Hospital emergency room and saw Dr. Cleary for complaints of headache, nausea, vomiting and migraine. (R. at 669-73.) Dr. Cleary noted normal physical examination results, and Plaintiff appeared comfortable, cooperative, alert and oriented with no acute distress. (R. at 672.) On August 18, 2012, Plaintiff returned to Tappahannock's emergency room with complaints of headache. (R. at 676.) Dr. Dudley treated Plaintiff and noted that Plaintiff had no syncope. (R. at 676.) Plaintiff appeared comfortable, alert and oriented, with no focal motor deficits and a normal gait. (R. at 677.) After receiving medication, Plaintiff "laugh[ed] with staff within about 20 minutes." (R. at 678.) The next day, Plaintiff returned to the emergency room with complaints of a headache, nausea and vomiting. (R. at 682.) Plaintiff vomited during triage and continuously cried. (R. at 684.) Plaintiff appeared alert and oriented, but also uncomfortable and in pain. (R. at 683.) Plaintiff reported passing out and possibly striking the right side of her head on a recliner chair, and stated that her boyfriend observed her unconscious for five minutes. (R. at 684.) Dr. Emmeth noted that Plaintiff's neurological evaluation from earlier that year contained no specific diagnosis. (R. at 684.)

17

On August 20, 2012, Plaintiff presented to Nurse Mitchell at King and Queen Family Practice, complaining of a headache. (R. at 631.) While there, Plaintiff passed out in the exam room but awakened and appeared alert by the time the nurses arrived. (R. at 631.) Plaintiff's gait appeared "slowed and unsteady," and Nurse Mitchell sent Plaintiff to the emergency room. (R. at 633.) Once transferred to the Memorial Regional Medical Center emergency room, Plaintiff treated with Mary Williams, P.A. (R. at 690.) Plaintiff appeared anxious and tearful, but neurological examinations tested normal. (R. at 692.) Plaintiff displayed normal coordination and a CT scan produced normal results. (R. at 692-93.)

On August 29, 2012, Plaintiff returned to King and Queen Family Practice for a follow-up appointment with Dr. Gwathmey. (R. at 627.) Plaintiff complained of a migraine and syncope, but Dr. Gwathmey's neurological examination yielded normal results with intact memory. (R. at 627-30.) On September 12, 2012, Plaintiff returned to King and Queen Family Practice, reporting a migraine and syncope. (R. at 623.) Dr. Gwathmey examined Plaintiff and again noted normal neurological examination results and recommended rest. (R. at 625-26.)

On September 17, 2012, Plaintiff returned to the Tappahannock Primary Hospital emergency room, complaining of migraines. (R. at 953.) Dr. McCorry noted no syncope, and Plaintiff appeared alert and oriented. (R. at 953-54.) Dr. McCorry also reported that "while walking to [the] restroom before triage, [Plaintiff] fell to [the] floor." (R. at 956.)

On September 25, 2012, Dr. Gwathmey treated Plaintiff for a migraine and syncope. (R. at 619.) Dr. Gwathmey recorded normal neurological examination results with intact memory and recommended rest. (R. at 621-22.) On October 24, 2012, Plaintiff returned to Dr. Gwathmey for a follow-up visit for migraines and syncope. (R. at 748.) Plaintiff reported that

18

her headaches improved with sleep, dimmed lights and quiet surroundings. (R. at 748.) Plaintiff

tested positive for dizziness, fainting, headaches and weakness, but negative for paresthesia or

seizures. (R. at 748.) Dr. Gwathmey again recommended increased rest. (R. at 751.)

On November 3, 2012, James Baylous, M.D., conducted and interpreted a CT scan. (R.

at 813.) Plaintiff displayed no evidence of intra-axial pressure or extra-axial hemorrhage. (R. at

813.) The next day, Plaintiff returned to the emergency room for migraines and treated with Dr.

Dudley. (R. at 969.) Plaintiff complained of headaches and associated vomiting. (R. at 969.)

Dr. Dudley noted Plaintiff's normal neurological examination results. (R. at 970-71.) Plaintiff

reported an inability to "keep down" medications prescribed on the previous day. (R. at 970-71.)

On November 12, 2012, Plaintiff returned for a follow-up examination with Dr.

Gwathmey. (R. at 744.) Plaintiff reported a syncope episode from approximately eight months

earlier. (R. at 744.) Plaintiff also reported that her symptoms improved with sleep, dimmed

lights and quiet surroundings. (R. at 744.) Plaintiff tested positive for dizziness, fainting,

headaches and weakness, but had an otherwise normal examination. (R. at 744-46.)

On November 21, 2012, Plaintiff returned to the Tappahannock Primary Hospital

emergency room for migraine and syncope. (R. at 808.) Dr. Cleary noted Plaintiff's normal

gait, neurological examination and psychiatric examination. (R. at 809.) Plaintiff reported no

problems with self-care. (R. at 810.) On the same day, Plaintiff presented to King and Queen

Family Practice for a follow-up examination with Nurse Mitchell. (R. at 739.) Nurse Mitchell

noted a normal physical examination and instructed Plaintiff to get more sleep. (R. at 741-42.)

On December 17, 2012, Mark Shawnik, D.O., treated Plaintiff in the emergency room for

migraine and syncope. (R. at 816.) Dr. Shawnik noted that Plaintiff arrived at the hospital in a

19

wheelchair with an unsteady gait, in distress and in pain. (R. at 820.) However, Plaintiff had normal neurological and psychological examination results, normal memory and orientation, and normal concentration. (R. at 817.) On December 20, 2012, Plaintiff returned to Dr. Gwathmey. (R. at 734.) Plaintiff reported that she experienced a syncope episode, but her headache symptoms improved with sleep, dimmed lights and quiet surroundings. (R. at 734.) Dr. Gwathmey recommended maintaining normal sleep and avoiding family stress. (R. at 737.) Plaintiff returned to Dr. Gwathmey on December 27, 2012, with no headache symptoms. (R. at 729.) Dr. Gwathmey made the same recommendations. (R. at 732.)

On January 7, 2013, Plaintiff returned to the Tappahannock Primary Hospital emergency room with symptoms of passing out and a tingling along her right side. (R. at 991.) Plaintiff denied loss of consciousness, but reported falling in the bathtub and that her dog woke her. (R. at 991.) No one witnessed the episode, and Plaintiff's boyfriend brought her to the hospital upon arriving home from work. (R. at 993.) Dr. Cleary reported normal neurological and psychiatric examination results. (R. at 992.)

On January 21, 2013, Plaintiff returned to the emergency room with a headache. (R. at 996.) Plaintiff blacked out after taking a final exam for wedding coordination. (R. at 996.) Plaintiff appeared in pain, but neurological examination results tested normally and Plaintiff displayed normal gait and memory. (R. at 997.) Dr. Dudley reported Plaintiff's hysterical affect, but found her more relaxed after medication. (R. at 997.) Once relaxed, Plaintiff could converse appropriately. (R. at 997.) Dr. Dudley reexamined Plaintiff and found normal funduscopic examination results, and Plaintiff appeared alert and cooperative. (R. at 997-98.)

20

On January 22, 2013, Plaintiff presented to Virginia Commonwealth University ("VCU") Health Neurology Clinic for an initial visit regarding intractable migraines. (R. at 797.) Robert Delorenzo, M.D., treated Plaintiff. (R. at 797.) Plaintiff appeared alert with normal gait, memory, attention and concentration. (R. at 798.) Dr. Delorenzo believed that Plaintiff's headaches might result from muscle spasms. (R. at 798.) Plaintiff reported a syncope episode during tests administered at Riverside Neurology, but tests showed no evidence of syncope. (R. at 797.)

On February 20, 2013, Plaintiff returned to the emergency room with migraines. (R. at 1002.) Dr. Cleary reported a normal neurological and psychiatric examination. (R. at 1003.) Plaintiff no longer took Keppra, felt "100 percent better [and] request[ed] to go home." (R. at 1003.) On February 26, 2013, Plaintiff presented Dr. Gwathmey at King and Queen Family Practice. (R. at 761.) Plaintiff reported a syncope episode witnessed by a friend and a passerby and told Dr. Gwathmey that her headaches occurred nearly every day. (R. at 761.) She appeared alert, oriented and cooperative, but anxious. (R. at 763.) Dr. Gwathmey recommended more rest. (R. at 763.)

On March 18, 2013, Plaintiff again visited the Tappahannock Primary Hospital emergency room for headaches and pain. (R. at 1007.) Plaintiff treated with Dawit Yohannes, M.D., complaining of seizures and migraines. (R. at 1007.) Dr. Yohannes reported normal neurological and psychiatric examination results. (R. at 1008.) Plaintiff claimed that her migraines began at age ten. (R. at 1010.)

On April 23, 2013, Plaintiff visited Middle Peninsula-Northern Neck Community Services Board for a preadmission screening report with Linda Sibley, S.C.P.E. (R. at 1024.)

21

Ms. Sibley noted that Plaintiff lived with her boyfriend and claimed to have developed seizures at age ten and took seizure medication until age seventeen. (R. at 1025.) Plaintiff also claimed that her seizures had returned in recent years after "many years" without them. (R. at 1025.) Plaintiff claimed to experience "black outs" during "rage episodes" her entire life. (R. at 1025.) Ms. Sibley noted that Plaintiff appeared rational and coherent. (R. at 1027.)

Plaintiff's medical records show that she repeatedly displayed normal affect (R. at 834, 839, 883, 901, 934, 1027), normal concentration, (R. at 798, 817, 834, 839, 883, 894, 901, 927, 997), normal memory, (R. at 621, 640, 643, 667, 798, 817, 883, 914, 927, 997), and she walked with a normal gait. (R. at 651, 667, 677, 798, 809, 834, 839, 902, 915, 997.) Treatment notes often described Plaintiff as alert and oriented, (R. at 640, 643, 647, 655, 658, 667, 672, 677, 683, 763, 820, 834, 883, 902, 919, 927, 954, 997), and her examinations produced normal results. (R. at 621, 625, 629, 639-40, 643, 646-47, 655, 672, 677, 683, 692, 741-42, 798, 817, 839, 883, 894, 970-71, 992, 997, 1003, 1008.) Plaintiff's CT scans, MRIs and EEGs also produced normal results on multiple occasions. (R. at 658, 693, 724-25.) Thus, the objective medical evidence contradicts Drs. Dolansky's opinion describing Plaintiff's marked limitations in attention, concentration and memory. (R. at 1228.)

Finally, Dr. Dolansky's opinions conflict with Plaintiff's daily activities. Throughout the relevant period, treatment providers noted Plaintiff's regular activities, including caring for children, walking, shopping, exercising, dancing, attending church, cooking and singing karaoke. (R. at 150, 549-50, 650, 762, 883, 1196.) Plaintiff studied to become a certified wedding planner to work with the public as well. (R. 1020.)

22

The ALJ accounted for Plaintiff's limitations that found support in the record. Plaintiff's RFC reflects limitations in her ability to understand, remember and carry out short, simple instructions consistent with the ability to perform unskilled work. (R. at 22.) The RFC also states that she can have occasional interaction with supervisors and co-workers, but she can have no interaction with the public. (R. at 22.)

In sum, substantial evidence in the record supports the ALJ's assignment of little weight to Dr. Dolansky's opinion, which conflicts with his own medical examinations, other objective medical evidence in the record and Plaintiff's admitted daily activities.

### 2. Dr. Ettigi's Opinions

Dr. Ettigi, a psychiatrist, first treated Plaintiff on July 9, 2015, and diagnosed her with PTSD and residual seizure disorder secondary to a TBI. (R. at 1225.) Dr. Ettigi completed a mental impairment questionnaire on July 23, 2015, opining that Plaintiff suffered from marked limitations in concentration, coordination with others, work-related decisions and completion of a workday without interruption from psychological symptoms. (R. at 1228.) He also found that Plaintiff displayed moderate limitations in understanding, remembering and carrying out one to two-step instructions. (R. at 1228.) Dr. Ettigi checked a box indicating that he believed these symptoms began in 2010. (R. at 1229.)

Dr. Ettigi also wrote a letter on August 4, 2015, in which he stated that Plaintiff suffered a TBI in 2004. (R. at 1230-31.) In the letter, Dr. Ettigi opined that Plaintiff could not make any definite plans for the day, and that she suffered severe limitations in her ability to "go out and be successful in any job setting." (R. at 1230-31.) Dr. Ettigi further stated that Plaintiff possessed

23

normal motor skills, logical thought, appropriate judgment, limited insight, poor cognitive skills and no hallucinations or delusions. (R. at 1230-31.)

The ALJ assigned "little weight" to Dr. Ettigi's opinions, because Dr. Ettigi issued these opinions after Plaintiff's date last insured and because the opinions did not comport with the longitudinal record. (R. at 29-30.) According to the ALJ, the objective medical evidence in the record did not support the TBI diagnosis. (R. at 29.) The ALJ also stated that the multiple CT scans, MRIs and EEGs showed normal results, and that Plaintiff's subjective account of her symptoms represented the only evidence of TBI. (R. at 29.) Finally, the ALJ found that Plaintiff's daily activities contradicted Dr. Ettigi's opinion, because Plaintiff walked, shopped for food in stores, cared for children and attended church. (R. at 29.) Substantial evidence supports the ALJ's decision.

Dr. Ettigi's opinions lack support from his own treatment notes. Plaintiff first treated with Dr. Ettigi in 2015, but Dr. Ettigi opined that her symptoms began in 2010 and provided no support for this finding. (R. at 1225, 1229.) Additionally, Dr. Ettigi stated that Plaintiff presented with normal motor skills, a normal gait and "fairly decent hygiene." (R. at 1231.) Yet, Dr. Ettigi found Plaintiff moderately limited in her ability to adhere to basic standards of neatness. (R. at 1228.)

Objective medical evidence during the relevant period also conflicts with Dr. Ettigi's restrictive opinions. Dr. Ettigi opined that Plaintiff suffered from marked limitations in concentration, work-related decisions and completion of a workday; but, as discussed above, Plaintiff presented to multiple medical professionals with normal concentration, memory and orientation. (R. at 640, 643, 647, 655, 658, 667, 672, 676, 683, 763, 798, 817, 834, 883, 902,

24

919, 927, 954, 997, 1027-28.)  Moreover, Plaintiff's CT scans, MRIs and EEGs all yielded normal results.  (R. at 658, 693, 724-25.)

Plaintiff's own accounts of head injuries and the onset of symptoms also conflict with Dr. Ettigi's finding that Plaintiff's symptoms began in 2010.  At different times in the record, Plaintiff claimed brain injury and the onset of symptoms since childhood, since 2006, since 2007 and since 2010.  (R. at 100, 162, 641, 759, 1052.)  Finally, Dr. Ettigi's opinion that Plaintiff has marked limitations in her ability to coordinate with or near others, get along with peers and maintain socially appropriate behavior conflicts with Plaintiff's daily activities.  (R. at 1228.) Plaintiff regularly cared for children, walked, shopped, exercised, danced, attended church, cooked and sang karaoke.  (R. at 150, 549, 650, 762, 883, 1196.)  Plaintiff even studied to become a certified wedding planner.  (R. at 1020.)  Thus, substantial evidence supports the ALJ's assignment of weight to Dr. Ettigi's opinion.

### 3.  Nurse Morrison's and Nurse McKay's Opinions.

Plaintiff first presented to Nurse Morrison on April 24, 2013.  (R. at 1219.)  She diagnosed Plaintiff with bipolar disorder, TBI and as having violent behavior and "inappropriate affect."  (R. at 1219-20.)  On February 11, 2015, Nurse Morrison completed a mental impairment questionnaire, opining that Plaintiff displayed marked limitations in remembering locations and work-like procedures, understanding and remembering detailed instructions, asking simple questions, requesting assistance, accepting instructions, responding appropriately to criticism from supervisors and getting along with co-workers or peers without distracting them.  (R. at 1222-23.)  On January 20, 2016, Nurse Morrison completed a disability impairment questionnaire, opining that Plaintiff could sit, stand or walk less than one hour during an eight-

hour workday. (R. at 1289.) Nurse Morrison further opined that Plaintiff's symptoms would frequently impair her ability to concentrate during an eight-hour workday. (R. at 1290.) Nurse Morrison noted Plaintiff's behavior as aggressive and violent under stress, and believed that her symptoms would cause Plaintiff to miss work more than three times per month. (R. at 1291.)

On November 2, 2016, Nurse McKay diagnosed Plaintiff with bipolar disorder and PTSD. (R. at 1260.) Nurse McKay completed a mental impairment questionnaire, opining that Plaintiff had marked limitations in understanding and remembering detailed instructions, carrying out simple instructions, maintaining attention and concentration, completing a workday without interruptions from psychological symptoms and performing at a consistent pace without rest periods of unreasonable length or frequency. (R. at 1263.) Nurse McKay also found that Plaintiff had moderate-to-marked limitations in remembering locations and work-like procedures, making simple work-related decisions and responding appropriately to workplace changes. (R. at 1263.)

The ALJ assigned little weight to both Nurse Morrison's and Nurse McKay's opinions. (R. at 28-29.) The ALJ appropriately identified Nurses Morrison and McKay as non-acceptable medical sources. (R. at 28-29.) Under the regulations, the ALJ can only consider an "acceptable medical source" as a treating source entitled to controlling weight. SSR 06-03p. A nurse practitioner does not qualify as an "acceptable medical source." *Id.* Thus, Nurses McKay and Morrison constitute "other source[s]," from whom the ALJ can consider evidence of the severity of Plaintiff's impairments and their effect on her ability to work.[6] 20 C.F.R. § 404.1513(a).

---

[6]    The record contains a duplicate of Nurse Morrison's 2016 disability impairment questionnaire. (R. at 1287-1291, 1307-11.) Rachel Huot, M.D., co-signed the duplicate report on January 23, 2017 — over a year after Nurse Morrison completed the original form. (R. at

26

Contrary to Plaintiff's contentions, the ALJ properly assessed these opinions and substantial evidence supports the ALJ's decision.

The ALJ noted that Nurses Morrison and McKay issued their opinions well after June 30, 2013 — the close of the relevant time period and Plaintiff's date last insured. (R. at 28, 1222-23, 1260-64, 1289-91.) Thus, the ALJ found that the opinions offered little to no probative value to the relevant time periods. (R. at 28-29.) Nurse Morrison treated Plaintiff once during the relevant time period (on April 24, 2013), but she did not issue her opinions regarding Plaintiff's limitations until February 2015 and January 2016 — years after Plaintiff's date last insured. (R. at 18, 1219, 1222, 1291.) Although Nurse McKay's facility treated Plaintiff in 2012, Nurse McKay herself did not examine Plaintiff at all during the relevant period and did not issue her opinion until November 2016. (R. at 29, 1252, 1264.)

To evaluate Plaintiff's limitations, Nurses Morrison and McKay completed, by hand, check-the-box forms and fill-in-the-blank forms with limited additional explanatory comments. (R. at 28-29, 1222-23, 1260-63, 1289-91.) "Courts in the Fourth Circuit have recognized the limited probative value of such checkbox opinion forms." *Shelton v. Colvin*, 2015 WL 1276903, at *3 (W.D. Va. Mar. 20, 2015) (citing *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("Such check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician.")); *see also Testamark v. Berryhill*, 736 Fed. App'x 395, 397-99 (4th Cir. 2018) (finding that the ALJ erred in assessing medical opinions by, *inter alia*, only

---

1311.) The ALJ noted this in his opinion and treated both Nurse Morrison's 2016 report and the duplicate signed by Dr. Huot as if they were completed by an acceptable medical source, even though the record contains no evidence that Dr. Huot personally examined Plaintiff at the time that Nurse Morrison completed the form in 2016. (R. at 28.)

citing treatment notes that predated plaintiff's alleged disability onset date and relying heavily on check-the-box forms completed by plaintiff's doctors).

Both Nurses Morrison and McKay checked boxes indicating that Plaintiff's limitations began on January 1, 2010. (R. at 28-29, 1223, 1264, 1291.) Because the date "January 1, 2010" appeared typed on the otherwise handwritten forms, the ALJ speculated that a third party placed the date in the documents. (R. at 28-29.) Moreover, neither Nurse Morrison nor Nurse McKay examined Plaintiff until years after 2010, and the ALJ explained that they possessed no actual knowledge of Plaintiff's condition at that time. (R. at 28-29 (noting that Plaintiff did not present to Nurse Morrison until 2013 and Nurse McKay's facility did not treat Plaintiff until 2012).)

In addition to the tenuous connection between their opinions and the relevant time period, the ALJ further discounted the opinions of Nurse Morrison and Nurse McKay, because they lacked consistency "with the evidence as a whole." (R. at 28-29.) As previously discussed, the objective medical evidence in the record indicates that Plaintiff had fewer limitations than both Nurses McKay and Morrison opined. Plaintiff frequently exhibited normal concentration, memory and orientation. (R. at 640, 643, 647, 655, 658, 672, 676-77, 683, 763, 798, 817, 834, 883, 902, 919, 927, 954, 997, 1027.) Yet, Nurse Morrison opined that Plaintiff's symptoms would prevent her from maintaining concentration throughout the workday, and Nurse McKay found that Plaintiff had marked limitation in maintaining attention and concentration. (R. at 1222-23, 1263, 1291.) Both Nurse Morrison and Nurse McKay diagnosed Plaintiff with mood disorders secondary to a brain injury. (R. at 1219, 1252.) However, Plaintiff's multiple CT scans, MRIs and EEGs produced normal results. (R. at 658, 693, 724-25.)

28

Nurse McKay's treatment notes in particular lack consistency with her opinion.  On July 18, 2016, Nurse McKay noted that Plaintiff displayed fair attention and concentration, with normal thought content, thought process and associations.  (R. at 1252.)  On September 6 and September 28, 2016, Plaintiff presented to Nurse McKay with a depressed mood, but she otherwise had unremarkable mental status examination results, including fair attention and concentration, normal thought processes, normal affect and normal behavior.  (R. at 1274, 1277.)  These treatment notes conflict with Nurse McKay's opinion regarding Plaintiff's marked limitations in concentration, memory, and attention.  (R. at 1263.)

Finally, Plaintiff's daily activities show that she engaged in multiple interactions with family and the community.  These activities contradict Nurse Morrison's findings that Plaintiff had marked limitations in her ability to interact with co-workers and peers.  (R. at 1222.)  Notably, Nurse McKay checked the "none-to-mild" boxes pertaining to Plaintiff's limitations with social interactions, except in the area of accepting instructions and responding to criticism from supervisors, in which Nurse McKay found Plaintiff moderately limited.  (R. at 1263.)  As discussed above, Plaintiff cared for children, walked, exercised, shopped, danced, attended church, cooked and sang karaoke.  (R. at 150, 549, 650, 762, 883, 1196.)  She studied to become a certified wedding planner to work with the public as well.  (R. at 1020.)

Because the opinions of Nurses Morrison and McKay shed little light on Plaintiff's condition during the relevant time period and lack consistency with Plaintiff's normal mental status examinations, normal laboratory findings and reported daily activities, the ALJ appropriately afforded the opinions little weight.  Thus, the ALJ did not err.

29

### B. Substantial Evidence Supports the ALJ's Evaluation of Plaintiff's Testimony Concerning her Mental Impairments.

Plaintiff argues that the ALJ erred in failing to "give appropriate reasons for discounting [her] testimony regarding her mental impairments." (Pl.'s Mem. at 29.)  Plaintiff argues that the ALJ incorrectly characterized Plaintiff's record as having "no significant mental status abnormalities supporting [her] allegation of disability." (Pl.'s Mem. at 29.)  Plaintiff notes that SSR 16-3p eliminated use of the term "credibility" from the ALJ's determination of validity of a claimant's statements. (Pl.'s Mem. at 28; Def.'s Mem. at 22.)  Because Plaintiff applied for DIB in 2012, SSR 96-7p — not SSR 16-3p — directs the ALJ's decision. [7]  Social Security Ruling 96-7p describes the two-step process set forth in 20 C.F.R. § 404.1529 for evaluating a claimant's symptoms when determining disability status.  Defendant responds that the ALJ correctly applied the two-step process and "relied on the regulatory factors set forth in 20 C.F.R. § 404.1529." (Def.'s Mem. at 23.)  Further, Defendant notes that the ALJ relied not only on Plaintiff's subjective statements, but on the entire record. (Def.'s Mem. at 24.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.  *Craig*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R.

---

[7]      Effective March 16, 2016, the SSA rescinded SSR 96-7p, superseding the ruling with SSR 16-3p.  Plaintiff filed her claim on August 6, 2012, before SSR 16-3p took effect.  As previously stated, the Agency lacks the power to engage in retroactive rulemaking.  Thus, SSR 96-7p applies to Plaintiff's claim.

§§ 404.1529(a); SSR 96-7p. The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p. The ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p; *see also* SSR 96-8p (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

31

Further, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably cause some of her alleged symptoms in step one of his analysis, but found Plaintiff's statements regarding the intensity, persistence and limiting effects of her impairments not entirely credible. (R. at 23.) The ALJ noted that Plaintiff described her alleged impairments as impacting her concentration, understanding and ability to follow instructions; however, the ALJ found these statements inconsistent with the record. (R. at 23-24.) The ALJ also noted multiple occasions where medical professionals described Plaintiff's normal thought content and cooperative attitude. (R. at 24.) The ALJ stated that Plaintiff understood, remembered and carried out simple instructions. (R. at 25.) All this evidence in the record, the ALJ concluded, proved "not congruent with the level of impairment that the [Plaintiff] has alleged." (R. at 25.)

Plaintiff completed a function report in which she stated that her symptoms affected her ability to concentrate, understand and follow instructions. (R. at 551.) However, in the same function report, she noted that she worked out, listened to music and watched television. (R. at 546.) Plaintiff also enjoyed reading, singing and talking on the phone. (R. at 550.) Throughout the relevant period, treatment providers noted Plaintiff's regular activities, including caring for children, walking, shopping, exercising, dancing, attending church, cooking and singing karaoke.

32

(R. at 150, 650, 762, 883, 1196.)  Plaintiff also studied to become a certified wedding planner, and she could pay bills and count change.  (R. at 549, 1020.)

As the ALJ noted in his opinion, (R. at 24-25), the longitudinal record includes multiple medical professionals describing Plaintiff's normal affect, (R. at 834, 839, 1027), normal concentration, (R. at 798, 817, 834, 839, 883, 894, 901, 927, 997), and normal memory.  (R. at 621, 640, 643, 667, 798, 817, 883, 914, 927, 997.)  The record also frequently describes Plaintiff as alert and oriented.  (R. at 640, 643, 647, 655, 658, 667, 672, 677, 683, 763, 820, 834, 883, 902, 919, 927, 954, 997.)

Additionally, the ALJ discussed multiple occasions where medical professionals prescribed conservative treatment instead of medication to treat Plaintiff's symptoms.  (R. at 24.)  Under the regulations, an ALJ may consider the medications and treatments used to alleviate a claimant's symptoms.  20 C.F.R. § 404.1529(c)(3)(iv)-(v).  If the claimant requires only conservative treatment, an ALJ is reasonable in holding that the alleged disability lacks the seriousness that the claimant alleges.  *Dunn*, 607 F. App'x at 274-75.  On seven occasions, treating physicians prescribed increased rest to treat Plaintiff's symptoms.  (R. at 622, 626, 732, 737, 742, 751, 763.)

Accordingly, substantial evidence — including Plaintiff's normal mental status examinations, activities of daily living and conservative treatment — supports the ALJ's credibility assessment.

### C.  The ALJ's RFC Assessment Properly Accounted for Plaintiff's Moderate Limitations in Concentration, Persistence and Pace.

Finally, Plaintiff alleges that the ALJ erred by posing a hypothetical to the VE that failed to incorporate all of Plaintiff's mental limitations.  (Pl.'s Mem. at 30-31.)  Specifically, Plaintiff

argues that the ALJ's hypothetical and corresponding RFC failed to account for Plaintiff's moderate limitations in concentration, persistence or pace. (Pl.'s Mem. at 31.) Plaintiff argues that this error warrants remand under *Mascio*, 780 F.3d at 638. (Pl.'s Mem. at 31.) Defendant responds that the hypothetical and corresponding RFC properly accounted for Plaintiff's ability to stay on task. (Def.'s Mem. at 25.) Further, Defendant asserts that the ALJ adequately explained why Plaintiff's moderate limitations in concentration, persistence and pace did not translate to additional limitations in the RFC. (Def.'s Mem. at 26.)

In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. § 404.1545(b). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis in the claimant's credible complaints. § 404.1545(e).

Social Security Ruling 96-8p instructs that the RFC "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio*, 780 F.3d at 636 (citing SSR 96-8p at *5). The Ruling further explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing

specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (citing (SSR 96-8p, at *7)).

Under *Mascio*, if the ALJ finds at step three that the claimant has moderate difficulties in maintaining her concentration, persistence or pace, the ALJ must address these difficulties when assessing Plaintiff's RFC. 780 F.3d at 638. Therefore, post-*Mascio*, reviewing courts must ensure that ALJs appropriately account for moderate difficulties when determining RFCs. *See Kearson v. Colvin*, 2016 WL 4318968, at *5-6 (E.D. Va. Aug.12, 2016) (finding that the RFC inadequately accounted for the plaintiff's moderate difficulties); *see also Handy v. Comm'r*, 2015 WL 9302972, at *3 n.4 (D. Md. Dec. 22, 2015) (explaining the distinction between moderate limitations and mild or no limitations). However, the Fourth Circuit did not hold that a finding of moderate limitations in concentration, persistence or pace automatically translates to a limitation in the RFC. *Mascio*, 780 F.3d at 638. Instead, the ALJ may exclude those mental limitations if he explains why they do not affect the claimant's ability to work. *Id.* Without this explanation, the Court must remand the case to the Agency. *Id.*

An ALJ satisfies *Mascio* by "providing a detailed discussion of Plaintiff's capacity for concentration, persistence, or pace." *See Thomas v. Colvin,* 2016 WL 1070826, at *4 (E.D. Va. Mar. 16, 2016) (finding *Mascio* satisfied because substantial evidence supported the RFC and there was no inconsistency in the ALJ's assessment of the plaintiff's concentration, persistence or pace limitations). Multiple district courts in the Fourth Circuit have held that ALJ's RFC assessment satisfies *Mascio* as long as it provides a detailed discussion of the plaintiff's capacity for concentration, persistence or pace. *See Sizemore v. Colvin,* 2016 WL 483140, at *3 (W.D.N.C. Feb. 5, 2016) (holding that the ALJ satisfied *Mascio* because he specifically

35

explained how the plaintiff's limitations translated into work limitations); *Mitchell v. Colvin*, 2015 WL 5690899, at *5-7 (W.D. Va. Sept. 28, 2015) (distinguishing *Mascio*, because the ALJ relied on medical evidence to support his conclusion and did not summarily conclude that a limitation of simple, unskilled work accounted for the plaintiff's moderate impairment in concentration, persistence and pace); *St. Clair v. Colvin*, 2015 WL 53107777, at *6 (W.D. Va. Sept. 11, 2015) (finding that an RFC assessment relying on medical opinion evidence that the plaintiff could "perform simple and repetitive tasks and maintain regular attendance in the work place," despite having moderate impairment in concentration, satisfied *Mascio*).

These cases establish that *Mascio* did not create a *per se* rule that a moderate impairment in concentration, persistence or pace always translates into an RFC limitation. 780 F.3d at 638; *Mitchell*, 2015 WL 5690899, at *7. Rather, *Mascio* highlighted the ALJ's duty to review the evidence and explain his decision when the claimant has moderate limitations in concentration, persistence or pace. 780 F.3d at 638.

### 1. The ALJ's Discussion of Plaintiff's Moderate Limitations in Concentration, Persistence and Pace Satisfied *Mascio*.

At step three, the ALJ found that Plaintiff had, "at most, moderate limitations" in concentrating, persisting or maintaining pace. (R. at 21.) The ALJ noted that Plaintiff had asserted a lack of concentration from her headaches and seizures, but that these allegations proved inconsistent with the longitudinal record. (R. at 23-24.) The ALJ relied on Plaintiff's admitted daily tasks and medical records to demonstrate how he arrived at his decision regarding limitations to concentration, persistence and pace. (R. at 24.) The ALJ noted that Plaintiff enjoyed walks in public on a regular basis. (R. at 21.) The ALJ also noted that Plaintiff shopped for food once per month, requiring her to plan a month in advance for her needs and to transport

36

a month's worth of food.  (R. at 21.)  Plaintiff took care of a dog and played with the dog

regularly.  (R. at 21.)  Plaintiff became certified as a wedding planner after her date last insured.

(R. at 21, 114-37.)  Finally, Plaintiff could pay bills, count change and handle a savings account.

(R. at 21.)  These activities, the ALJ explained, suggested that Plaintiff had only moderate

difficulty with concentration, persistence and pace.  (R. at 21.)

The ALJ concluded that Plaintiff's RFC limited her to understanding, remembering and

carrying out short, simple instructions consistent with the ability to perform unskilled work.  (R.

at 22.)  And, she could have occasional interaction with supervisors and co-workers but no

interaction with the public.  (R. at 22.)  The ALJ noted that Plaintiff's medical records began on

January 6, 2010, and that no medical evidence in the record covers the time from Plaintiff's

alleged onset date of February 15, 2008 to January 6, 2010.  (R. at 22.)  Addressing Plaintiff's

alleged problems with concentration and memory, the ALJ noted that Plaintiff's complaints

conflicted with medical records showing normal attention and memory, as well as unremarkable

mental status examinations. (R. at 24.)

To support the mental RFC assessment, the ALJ discussed Plaintiff's medical records and

activities of daily living.  (R. at 24-25.)  While discussing Plaintiff's medical records, the ALJ

pointed to multiple occasions where Plaintiff appeared alert and oriented with "normal mood and

affect."  (R. at 24.)  The ALJ noted medical observations describing Plaintiff's normal thought

content and cooperation.  (R. at 24.)  The ALJ also discussed Plaintiff's activities of daily life,

such as caring for children, attending church, walking, shopping, caring for pets, working as a

wedding planner and traveling.  (R. at 24-25.)  Finally, the ALJ noted that, at times, Plaintiff did

not comply with her prescription medications.  (R. at 24.)

Consistent with *Mascio*, the ALJ engaged in a detailed discussion regarding Plaintiff's moderate limitations in concentration, persistence and pace.  The ALJ qualified the mental RFC assessment using Plaintiff's daily activities and medical records.  Thus, the ALJ properly explained why his findings regarding Plaintiff's moderate limitations in concentration, persistence and pace did not translate into RFC limitations beyond understanding, remembering, and carrying out short, simple instructions consistent with the ability to perform unskilled work and limiting her to occasional interaction with supervisors and co-workers, but no interaction with the public.  Accordingly, *Mascio* does not warrant remand.

### 2.   Substantial Evidence Supports the ALJ's Mental RFC Assessment.

Substantial evidence supports the ALJ's mental RFC assessment.  As discussed above, the record repeatedly describes Plaintiff's normal affect, memory, orientation and cooperation.  (R. at 640, 643, 647, 655, 658, 667, 672, 677, 683, 763, 798, 817, 834, 883, 902, 919, 927, 954, 997, 1027.)  These observations support the ALJ's mental assessment.

Additionally, Plaintiff's daily activities in the record support the RFC assessment.  Plaintiff reported often walking or exercising in her free time and to deal with stress.  (R. at 150, 546, 549, 762.)  Plaintiff also described shopping for food and planning for an entire month's worth of food.  (R. at 549.)  Plaintiff also played with her dog.  (R. at 546-47.)  She took care of children and became a certified wedding planner, both indicating significant social interactions.  (R. at 1020.)  Finally, Plaintiff also described managing her own bills and money.  (R. at 549.)

### D. The Hypothetical Posed to the VE Properly Reflected Plaintiff's Mental Impairments.

Plaintiff also argues that, because the RFC failed to properly account for Plaintiff's moderate limitations in concentration, persistence and pace, the ALJ posed a flawed hypothetical

to the VE. (Pl.'s Mem. at 30-31.) Defendant responds that substantial evidence supports the ALJ's RFC assessment and the corresponding hypothetical. (Def.'s Mem. at 25-28.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, she can perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(f). The Commissioner can carry her burden at the final step with the testimony of a VE. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). During the VE's testimony, the ALJ must pose hypothetical questions that accurately represent the claimant's RFC based on all of the record evidence and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Id.* Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*; *Hines v. Barnhart,* 453 F.3d 559, 567 (4th Cir. 2006) (finding that the VE's testimony had no value, because he did not take all of the claimant's impairments into account).

Here, the ALJ limited Plaintiff to understanding remembering and carrying out short, simple instructions consistent with unskilled work and only occasional interaction with supervisors and co-workers, but no interaction with the public. (R. at 22.) The ALJ satisfied *Mascio* by explaining why Plaintiff's moderate limitations in concentration, persistence and pace did not translate into RFC limitations beyond short, simple instructions consistent with the ability to perform unskilled work and occasional interaction with supervisors and co-workers, but no interaction with the public. (R. at 22-25.) Based on inconsistencies between Plaintiff's

39

complaints and her medical records and activities of daily living, the ALJ found Plaintiff's struggles with memory and concentration "not congruent" with the medical evidence.  (R. at 25.)

At the hearing, the ALJ's second hypothetical encompassed all of the limitations in the ultimate RFC.  (R. at 22, 75-76.)  The VE responded that such an individual could perform jobs existing in significant numbers in the national economy — including the jobs of box bender, mold filler and hand packager.  (R. at 30-31, 76-77.)  Because the ALJ's RFC assessment complies with *Mascio* and finds support from substantial evidence in the record, and the ALJ articulated the RFC in his hypothetical, the ALJ did not pose a flawed hypothetical to the VE. The hypothetical took into account all of Plaintiff's medically determinable physical and mental limitations, as described in the RFC.  Accordingly, the ALJ did not err.

V.     CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure**

40

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

                                               /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: October 16, 2018

41